USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: November 3, 2009

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
PATRICK BENNETT,                                            :
                                                            :
                        Petitioner,                         :        03 cv. 1852 (PAC)
                                                            :        97 cr. 639 - 1 (PAC)
            -against-                                       :        MEMORANDUM & OPINION
                                                            :
UNITED STATES OF AMERICA                                    :
                                                            :
                        Respondent.                         :
                                                            :
------------------------------------------------------------x

HONORABLE PAUL A. CROTTY, United States District Judge:

This Court has previously considered and denied Patrick Bennett's ("Bennett")

petition under 28 U.S.C. § 2255 to vacate, set aside, or correct the 22-year sentence he

received on July 5, 2002, following his conviction, in two separate trials, on various

counts of conspiracy to obstruct justice and commit perjury; obstruction of justice;

perjury; securities fraud; bank fraud; money laundering; and engaging in monetary

transactions with criminally-derived property.

The petition asserted two grounds for relief:

(1)  Under Blakely v. Washington, 542 U.S. 296 (2004), his conviction should be

set aside because 18 years of the 22-year sentence was based solely upon judicial

findings of fact contrary to Apprendi v. New Jersey, 530 U.S. 466 (2000).

(2)  Ineffective assistance of trial and appellate counsel.  At trial, the cumulative

impact of 19 prejudicial errors and omissions by trial counsel, denied Bennett his

Sixth Amendment right to the effective assistance of counsel.  Appellate counsel

was also ineffective for failure (i) to raise the omission of an obvious jury

1

instruction, and (ii) to raise the "cumulative errors of his trial counsel on direct appeal.[1]

The Court also refused to issue a Certificate of Appealability, determining there was no question of substance for appellate review, and the petition had failed to make a "substantial showing of the denial of a constitutional right." Bennett v. United States, No. 03 Civ. 1852 (PAC), 2006 WL 738162, at *16 (S.D.N.Y. Mar. 22, 2006) (28 U.S.C. § 2253(c)(2), and Fed. R. App. P. 22(b)).  On June 26, 2006, the Court denied Bennett's motion for reconsideration.  Bennett v. United States, No. 03 Civ. 1852 (PAC), 2006 WL 1751242 (S.D.N.Y. June 26, 2006).

Bennett appealed the Court's decision to the Second Circuit on numerous grounds. On January 12, 2007, the Second Circuit granted Bennett a Certificate of Appealability on two of the 19 issues[2] raised in the § 2255 petition:

> (1) whether defense counsel was ineffective for allegedly overriding [Bennett's] desire to exercise his constitutional right to testify in his own defense. [citations omitted]; and

> (2) whether [Bennett] was prejudiced by defense counsel's alleged failure to ensure the right to testify when the issue is analyzed in connection with counsel's failure to object to either the district court's omission of an intent to harm instruction, or the wording of the instruction on the "good faith" defense, particularly in light of evidence of jury confusion as to intent … [citations omitted]

Bennett v. United States, 06-2443-pr, Order dated Jan. 12, 2007.

---

[1] One of Mr. Bennett's counsel on the 2255 petition, Michael Pinnisi, had some involvement in his appeal, including filing the notice of appeal.  The Government raised the issue of whether there might be a conflict; and Mr. Bennett said "I don't believe there is a conflict.  And, to the extent there is an allegation there is—I knowingly and voluntarily waive any such conflict."  (June 8, 2009, Tr. P. 4).
[2] Of the 19 enumerated errors, Mr. Bennett did not seek certification for 8 errors: 8, 9, 10, 11, 13, 16, 18, and 19, Petitioner's Second Circuit Motion for a Certificate of Appealability, dated July 24, 2006, at 24 n.4.

After briefing the appeal and argument, on December 3, 2008, the Second Circuit remanded the matter to this Court for the limited purpose of making findings of fact relevant to the two issues for which it granted a Certificate of Appealability:

> [I]t would be useful to us in deciding this appeal for the district court to determine, with the assistance of evidence, in affidavit form or otherwise, from the petitioner's trial counsel, and such other evidence as may be available and relevant, the circumstances under which counsel undertook the actions and omissions that the petitioner alleges overrode his desire to testify. More specifically, we hesitate to determine whether counsel's assistance was ineffective without first affording him an opportunity to be heard and to present evidence, in the form of live testimony, affidavits or briefs. [citations and quotations omitted]

Bennett v. United States, 06-2443-pr, Order dated Dec. 3, 2008.

Pursuant to the procedures set forth in U.S. v. Jacobson, 15 F.3d 19, 22 (2d Cir. 1994), the Court issued its mandate directing the District Court to conduct such proceedings and to determine the issues referred to above.

Accordingly, the Court held a hearing on June 8, 2009 and June 9, 2009, during which it heard testimony from Bennett; John Byrnes, from the Federal Defenders Office for the Southern District of New York; and two of Bennett's trial attorneys from the Federal Defenders, Mark Gombiner and Ian Yankwitt.[3] Following the hearing, both Bennett and the Government provided the Court with proposed findings of fact and conclusions of law, as well as memoranda of law supporting their proposed conclusions.

---

[3] In addition, Bennett called as witnesses his former wife, Gwen Bennett, and a friend, Patricia Ferris. The Court excluded their testimony as irrelevant and hearsay. Bennett also offered affidavits from his father, Edmund Bennett, and a financial consultant, Carl Pergola, who was retained to assist at the first trial. Mr. Pergola did not testify at the first trial and he was not retained for the second trial. The Court excluded the affidavits as irrelevant.

Bennett did not accept the explicit limitations contained in the Second Circuit's Orders of January 12, 2007 and December 3, 2008.  He attempted to amend the 2255 petition.  The Court denied the motion.  Bennett v. U.S., 03 Civ. 1852 (PAC) (S.D.N.Y. June 4, 2009).

At the hearing, Bennett raised numerous issues outside the scope of the Jacobson proceeding.  Indeed, Bennett raised issues which had not been included in the 19 claimed errors which served as the basis for the original 2255 petition.  (See, for example, Bennett's arguments about (a) alleged failure to retain an exculpatory financial expert, Bennett's Proposed Findings of Fact,¶86-118; and (b) alleged failure to secure exculpatory evidence of Bennett's good character, his family and community ties, Bennett's Proposed Findings of Fact,¶119-124).

The Court made clear to Bennett that the Orders of the Second Circuit limited the Jacobson proceeding to two issues:

(1)  whether defense counsel was ineffective for allegedly overriding Bennett's desire to exercise his constitutional right to testify in his own defense; and

(2)  whether Bennett was prejudiced by defense counsel's alleged failure to ensure the right to testify when the issue was analyzed in connection with counsel's failure to object to either the district court's omission of an intent to harm instruction or the wording of the instruction on the good faith defense, particularly in light of the evidence of jury confusion as to intent.  (Tr. 284:22-287:09; see also 189:18-23; and 204:01-13).

The first issue—whether defense counsel was ineffective for overriding Bennett's desire to exercise his constitutional right to testify—had its genesis in alleged Error 17 which raises a different issue that Bennett now asserts.  Error 17 reads as follows:

<u>Defense counsels performance improperly interfered with Movants
constitutional right to testify at trial.</u>

On the second day of trial, prior to any evidence being submitted against Movant,
a discussion took place at a social luncheon between the district court, then U.S.
Attorney for Southern District of New York, Mary Jo White, and head of Legal
Aid Society, Leonard Joy concerning Movant's case.  Based on the version of this
discussion relayed to Movant by Mr. Joy, Movant became very upset and
expressed his immediate concern to Mr. Joy and Mr. Gombiner, that Movant felt
the district court was predisposed of his guilt.  Neither Mr. Joy, Mr. Gombiner,
nor anyone at Legal Aid Society, advised Movant, after expressing these
concerns, of his legal right to immediately put this incident on the record to seek
clarification from the district court; and, or ask for recusal.  Movant's 'fear' of the
district court's predisposition of his guilt, became a primary reason Movant did not
testify at the second trial.  See Bennett affidavit.  Ultimately, a recusal request
was filed months after trial, for the balance of the proceedings, and the district
court put on the record, January 28, 2000 hearing, pages 1-8, the contents of the
above discussion.  Movant has sworn that this was a materially different version
from that told to him by Mr. Joy, and that if the district court's comments had been
on the record immediately at trial, it would have clarified what took place,
relieved Movant's concern, at the time, over the district court's predisposition.
Movant's testimony was important to his defense, Movant has stated, if made
aware of his rights by counsel, he would have immediately requested this incident
been put on the record.  Further, Mr. Gombiner was [sic] further interfered with
Movants [sic] right to testify in erroneously advising Movants [sic] early in the
trial, that Movant's first trial testimony could and would be entered into evidence
and as a result spent no time preparing with Movant for his direct examining,
then informing Movant at the end of trial, he had been mistaken and all of
Movant's First Trial Testimony could not be entered into the record.

Here, we have a 'unique' set of circumstances.  No speculation is needed as to how
Movant would testify or its probable results.  Movant had testified at his first trial.
All second trial counts of conviction ended in jury deadlock and mis-trial.

The second issue—whether Bennett was prejudiced by defense counsel's alleged

failure to ensure his right to testify when considered in conjunction with counsel's failure

to object to the 'intent to harm' and 'good faith defense' jury instructions—is based on Errors 4

and 5 of the petition.  Those claimed errors read:

4.  Defense counsel's misunderstanding of the law in failing to request or object to lacking "intent to harm" instruction for the Bank Fraud counts was a fundamental misunderstanding of the law.

It is a long established law of the Second Circuit that "intent to harm" is an essential Element of the Bank Fraud scheme to defraud offense.

Lack of criminal intent, was Movants [sic] defense at trial, see opening pages 51, 52, 69 and closing page 2328-2329, and there was sufficient evidence in the record for a finding that there was no intent to harm the banks.  The Banks received physical possession of original, over-collatorized, insured against loss leases that the Banks perfected their security interest in.  The leases were chosen by the Banks and delivered prior to the closing of the transaction.

However, the jury was never instructed that "intent to harm" is an essential element of bank fraud.  Defense counsel expressed a fundamental misunderstanding of the law by requesting an intent to harm instruction for the security fraud counts where it is not an element, see request to charge page 10, request 6, but failed to request an "intent to harm" instruction for the Bank Fraud counts, where it is an essential element.  see 6-4-99 request to charge.  Defense counsel does not dispute this confusion or misunderstanding.[]  Failure to request, or object to lacking "intent to harm" instruction was constitutionally deficient performance of counsel, for the bank fraud counts both at trial and on appeal.

5.  Defense counsels failure to recognize that a "no ultimate harm" instruction jury instruction had been added, and failure to object to it, constituted ineffective assistance of counsel.

Movant requested a "good faith" jury instruction request to charge, page 11, request 6.  [T]he District Court ruled, "Denied, except as charged," page 2234, and sua sponte added a "no ultimate harm" instruction, page 2453-2454.  Defense counsel had failed to discover this fact at the time he gave his summation.  See error 11,.[4]  This "oversight" or error was particularly damaging, because Movant's defense was that he never had criminal intent, and in regards to the Bank Fraud counts the uncontroverted evidence established that the Banks immediately received the over-collateral prior to the transaction.  See error 4.  Defense counsel was deficient in failing to (a) object to this added instruction and (b) by failing to be aware of it prior to summation and present to the jury record evidence mitigating this instruction.  This was another instruction found to be error on direct appeal, but no reversible error under a plain error review, and also was not given at the first trial.

In combination, by failing to recognize the instruction had been added, trial counsel was deficient in not (a) objecting to the instruction to preserve it for appellate review, and (b) arguing to the jury, at least in regards the Bank Fraud

---

[4] Error 11 has been abandoned.  See footnote 2 at page 2, supra.

6

counts, that the structure of the transaction precluded the applicability of this instruction.  As a basis for guilt this was particularly prejudicial on the Bank Fraud counts both at trial and on appeal, where counsel was also ineffective in misunderstanding the law and failing to request an 'intent to harm' instruction, see error 4.

On direct appeal, the Second Circuit found no error with regard to either claimed deficiency.  If the jury instructions were not erroneous, it is hard to see how defense counsel's failure to object could have prejudiced Bennett.  Nonetheless, the claimed errors now return in the §2255 petition as examples of ineffective assistance of counsel.  The real kernel of Bennett's argument concerning Errors 17, 4 and 5 is based on his conjecture that 'if only' he had been told by his counsel that his right to testify was of constitutional dimension, and 'if only' he knew or had been told by his counsel that intent to harm was a material element of the claims against him, then he would have taken the stand, testified, as he did at his first trial, and perhaps have been able to get another hung jury.

Bennett's speculation is not, however, supported by the facts that were established at the hearing on June 8 and 9, 2009.

Mark Gombiner, a trial attorney with more than 31 years experience, testified that he represented Mr. Bennett starting in October, 1998 (Tr. 13:25-14:06), and continuing to June 10, 1999.  (Tr. 17:22-23)  He was co-counsel for Bennett at the first trial which lasted three months, and lead counsel for Bennett at the second trial which lasted three weeks.

Mr. Gombiner testified that:

In any case where there is any possibility that the case is going to go to trial, I always discuss with the client the fact that he has the right to testify. I mean, it was often in the context of, look, you have an absolute right to testify but I think you would be crazy to do so for the following reasons because, I mean, I advise the clients as well as to whether or not I think

they should testify but I always tell them they have the right to testify.
(Tr. 16:03-10).

According to Mr. Gombiner, such a conversation would take place:

well before the trial starts because you need to determine before the trial begins,
you at least have to have a sense as to whether or not you are going to put your
client on the stand because that's going to dictate much of your other strategy.  (Tr.
16:19-23)

In those instances when Mr. Gombiner recommends that a client not testify, he

makes clear it is the client's decision.  He tells his clients:

I always tell them that, look this, is one of the really few decisions that is
up to you rather than up to me, the decision whether to plead guilty or to
go to trial, that's your decision.  And, the decision whether to testify or not,
that's your decision.  Most of the other decisions, they tell me that's going
to be my call.  (Tr. 17:06-11)

Mr. Gombiner's general practices were in place in 1998.  (Tr. 17:12-18)

Bennett testified at the first trial.  With regard to the perjury and obstruction of

justice counts of the indictment, he admitted the charges.  Bennett believed that if he

admitted to those crimes, he would be able to credibly explain the lease, securities and

bank fraud charges.

Mr. Gombiner was co-counsel at the first trial; indeed, he had summed up, and he

was fully familiar with the complete record.  At the conclusion of the first trial, the jury

could not reach a unanimous decision on any count, except for the perjury and

obstruction of justice counts.  After the trial, Mr. Gombiner spoke with the jury.  He

learned that they were 10-2 for conviction, and "none of them said that Mr. Bennett's

testimony was a factor that operated in his favor." (Tr. 25:03-05)  The jurors reactions

varied from just putting "his explanations aside" to concluding that Bennett was not telling

the truth.  (Tr. 25:08-09)

Mr. Gombiner knew that a hung jury was not common, and that most securities frauds cases ended in a conviction. (Tr. 26:19-20) Further, his experience was that retrials did not go better for defendants. Negotiating a plea made sense and given the results of the first trial, Bennett had some leverage to negotiate a favorable plea.

Before the second trial, Mr. Gombiner had a 'heated' discussion with Bennett about pleading guilty. (Tr. 26:11-17, 29:02-04) But pleading was not 'what Mr. Bennett wanted to do. He wanted to go to trial again and, you know, that was obviously his right. And, you know, so that happened.' (Tr. 26:15-17)

Since Bennett chose to go to trial again, Mr. Gombiner recalls discussing what the defense would be. 'Should we put Mr. Bennett on again? Because that was a decision we had to make before we started the second trial.' (Tr. 27:17-19) Mr. Gombiner recommended that Bennett not testify. Mr. Gombiner did not find Bennett's testimony at his first trial to be particularly effective. (Tr. 31:01-12) Further, he knew Bennett would have 'to testify the same way he had as the first trial.' (Tr. 29:22) Bennett could not come up with a new story or explanation. Mr. Gombiner felt that the Government's cross examination of Mr. Bennett at the first trial was deficient, and non-effective. But that ineffectiveness would be unlikely at the second trial. Mr. Gombiner believed that if Bennett took the stand again, the Government would be more effective and fully exploit Bennett's perjury and obstruction of justice conviction. (Tr. 30:11-20)

When asked whether it was clear that it was Mr. Bennett's 'decision as to whether or not to testify,' Mr. Gombiner answered:

> I mean, I do not have any specific recollection of any conversation where I
> sat down and said, Mr. Bennett, under the due process clause and under
> the compulsory process clause, etc., that you have a right to testify. I don't
> recall any discussion like that. I doubt if I gave any speech about it like

that but I know we discussed the fact that that he would have had that it
was up to him.  I mean, I think that was actually implicit.  He testified
already so I wasn't really that I don't think that was probably foremost in my
mind but to the extent it would have been my practice to tell him that.  I'm
sure he knew that already.  Okay, I'm not sure he knew it because I'm not
Mr. Bennett, but—

Mr. Pinnisi:  Objection.  This is going beyond the question.

Court:  Overruled.

A.  That's best I can recollect about it.  (Tr. 32:08-25)

Ian Yankwitt assisted Mr. Gombiner at Bennett's second trial.  While Bennett's

attorney attacked Mr. Gombiner's lack of financial knowledge and experience, no such

attack was made on Mr. Yankwitt.  Perhaps this is because Mr. Yankwitt currently runs

an investment management firm.

Mr. Yankwitt recalls advising Mr. Bennett not to testify because he had admitted

to perjury and to obstruction of justice; indeed Mr. Yankwitt believed Bennett's testifying

at a second trial was "a really bad idea."  (Tr. 100:14)  Even though Mr. Yankwitt knew

that the prior testimony concerning perjury and obstruction of justice would be admitted

into evidence, it was one thing to have something read into the record, but quite another

to have "somebody beat up the witness with it, especially if that witness is the defendant.

And I thought that having been essentially locked into that because it is what he testified

to at the prior trial, that an effective cross would be devastating to any chance of

acquittal."  (Tr. 101:01-06)

Notwithstanding his advice not to testify, Mr. Yankwitt was just as clear that it

was Bennett's decision to make:

To the best of my recollection, I always made clear to clients that it was
their decision and it was their decision for two reasons:  Well, it was their
decision because the constitution gave them that right.  The constitution

gave them that right for two reasons: that it wasn't just happenstance, one, in many ways it was most important thing that would happen at a trial; and two that no matter how emphatically I held that opinion no matter how emphatically I held that opinion I could be wrong, that I didn't have a crystal ball and that perhaps there was an explanation that would not be devastating to the jury but that notwithstanding that, my advice was what my advice was.

So, to just try and give a complete answer to your question, do I have a specific recollection of saying any of those things to Pat?  No I don't.  Is it the best of my recollection and it was my practice that I always said those things when I talked to a defendant about waiving significant rights?  Yes. (Tr. 101:10-102:02)

Mr. Yankwitt distinguished that right (to testify or not to testify) from the more tactical issues, such as what to ask about on cross examination.

['T]his decision [i.e. to testify or not to testify] was the exact opposite of that, that in this decision, the client had the right to say, yes, Mr. Yankwitt, I have heard you out, thank you very much, but it is my decision and I am making it in X way." (Tr. 102:14-17)

Mr. Yankwitt did specifically recall speaking with Bennett about whether he would testify.  During the conversation, which took place on a Saturday shortly after Mr. Yankwitt finished reading the transcripts of the first trial, Bennett:

expressed some during the conversations that we were discussing or that I was discussing he certainly expressed some skepticism.  He certainly wanted to know why I was of the view I held the view that I held.  He asked me questions from which I took that he was thinking about testifying in his own defense and he wanted to know why I thought it was such a bad idea.  (Tr. 103:15-21)

Shortly after this conversation, "Mr. Gombiner came to me and said, yeah, I spoke to Pat.  He's fine, he's not testifying.  In sum and substance, not those exact words." (Tr. 104)  After the Government had rested, Mr. Yankwitt testified Mr. Bennett never said he changed his mind and now wished to testify.  (Tr. 104:17-23)

Case 1:97-cr-00639-VSB   Document 320   Filed 11/03/09   Page 12 of 23

Bennett's testimony is much different; and his counsel's arguments do not clarify precisely what Bennett's argument is on this issue.  There is also a disparity between Bennett's affidavit in support of his 2255 petition and the current iteration of his argument.

While the Second Circuit's first question is "whether defense counsel was ineffective for allegedly overriding Bennett's desire to exercise his constitutional right to testify in his own defense," counsel stated "obviously our claim was never that Mr. Bennett was chained to a chair." (Tr. 291:13-14)  Counsel also stated "we have never made a claim that his attorneys told him he couldn't testify . . . ." (Tr. 292:14-15)  Instead, counsel now claims there should have been "more meaningful discussions."  According to counsel had such "meaningful discussions" occurred, Bennett would have appreciated the "significance of testifying" and would have testified.  (Tr. 292:22)  Bennett's affidavit in support of the 2255 petition makes it clear, however, that he had a choice, and he made the choice to not testify at the second trial.  (Tr. 272:06-11)

Prior to the first trial, Mr. Bennett concedes that his attorney, David Levitt from the Federal Defenders, reviewed the indictment with him and broke the counts of the indictment into various categories (e.g., lease fraud; securities and bank fraud; money laundering; perjury; and obstruction of justice).  Bennett also concedes that there was a preliminary discussion of whether he would plead or whether he would go to trial.  (Tr. 170:04-23)  But Bennett wanted to go to trial so that he could testify: "[Y]ou have no argument with me because that's why I'm going to trial.  I want to tell my side of whatever the allegations are.  And we were in total agreement from day one I would be testifying."

12

(Tr. 160:21-25)  Bennett opted for trial; and having chosen to go to trial, he also chose to testify at his first trial.

Bennett agrees that there was a discussion between trials of taking a plea, but he maintains the conversation took place with John Byrnes, not Mark Gombiner.  He denied ever discussing a plea with Mr. Gombiner.  Despite being "browbeaten" by Mr. Byrnes (Tr. 169:15), Bennett insisted that he was "going to trial again" (Tr. 169:25), and he refused to authorize plea negotiations.  (Tr. 170:04-171:02)

Logic and experience suggest that once a defendant decides he is not going to plead, but instead going to trial, the next question is whether the defendant should testify or not testify.  Both Mr. Gombiner and Mr. Yankwitt testified it was their practice to have such a discussion.  Bennett maintains there was no discussion between the two trials of whether or not he would testify at the second trial.[5]  He concedes the issue was discussed, but it did not come up until "about a week into the trial." (Tr. 174:14)  The conversation was precipitated by an event which occurred during a luncheon recess after the second day of trial.

Bennett said he was told by Leonard Joy, the head of the Federal Defenders Office, that at a luncheon Judge Martin approached Mr. Joy and Ms. Mary Jo White, who was then the U.S. Attorney for the Southern District, and said

> "words to the effect, why is this Bennett case going to trial?  And then he said words to the effect that you, you know, explore available plea bargains.  And I'm repeating to you what Mr. Joy told me and it would seem like 10 years would be enough in a case like this." (Tr. 175:19-22)

---

[5] Bennett agrees that he was advised that the jury was 10-2 for conviction (Tr. 172:10-11), but he denies being told anything about the substance of his testimony.  (Ibid.)  He has a different recollection of his testimony at the first trial.  He claims Messrs. Levitt and Gombiner told him that the jury "seem[s] to really be paying attention to what you are saying so just keep up doing whatever you're doing."  (Tr. 168:02-03)  Levitt reminded him "we have an opportunity to have me testify again, which is what I have come to learn the term is redirect."  (Id.:07-08)  Of course, there is nothing inconsistent with paying the jury's attention to Bennett's testimony and later concluding that he was not telling the truth.  (Tr. 25)

Bennett maintained that he was both upset and angry because the discussion assumed he was guilty.  (Tr. 175:23-176:02)  Bennett asked himself "how can this judge have me guilty already." (Tr. 176:14-15)  Further, he linked the conversation with the discussion with Mr. Byrnes, which occurred between the two trials, about whether he should negotiate for a plea or go to trial again.  (Tr. 176:12-15)  The discussion between Mr. Joy and Judge Martin was not raised with Judge Martin during the course of the second trial.

After the trial, and new counsel was retained (present counsel in this §2255 proceeding), counsel moved to recuse Judge Martin based on the May, 1999 conversation.  At the hearing, which Bennett attended, Judge Martin said he had the conversation, but explained he had "no predisposition" on the matter.  (Tr. 178:08)

Bennett maintains that had he known during the trial of Judge Martin's unbiased attitude (as explained by Judge Martin in January 2000) he would have made a different decision on whether he would have testified at his second trial.  According to Bennett, a week into the second trial he noticed "the fast pace, I saw Mr. Gombiner and Mr. Yankwitt preparing summations on the fly." (Tr. 179:17-18)  He went to Mr. Gombiner

> "assuming I was going to testify because that was my defense and, if anything, I knew my testimony from being cross examined would be better prepared at the second trial because it wouldn't have changed but it would have been much clearer and focused and better organized after I heard a lot of the cross examination myself." (Tr. 180:13-18)

Bennett claims to have told Mr. Gombiner that "I know we haven't spent any time preparing, I see the quick pace of this trial, and I started to have a conversation." (Id.:21-22)  During the conversation, Bennett said "but, I got a big problem with this, my opinion that Judge Martin is predisposed against me . . . ." (Id.:23-24)  Allaying Bennett's

14

concerns, Mr. Gombiner responded "look, I know the government's [sic] going to want to put into evidence your first trial admissions, and when they do that I'll put in your transcripts and you won't have to testify." (Tr. 184:02-05)

Again, according to Bennett, this discussion did not occur until one week into trial. While he thought his live testimony would be better, Bennett "had this predisposition of Judge Martin having me guilty" (Tr. 184:23-24), so he accepted Mr. Gombiner's suggestion that Bennett's entire testimony from the first trial be introduced and he chose not to testify. Bennett also recalls a conversation the same day or the next day with Mr. Yankwitt about testifying or not testifying, but "it was a moot point. In my mind, I wasn't testifying now. My transcripts were coming in." (Tr. 185:08-09)

Both Mr. Gombiner and Mr. Yankwitt both denied that Bennett ever mentioned the conversation among Mr. Joy, Mary Jo White and Judge Martin as a basis for making a motion to recuse Judge Martin or discussing the conversation in any way with respect to Bennett's testifying.

Bennett asserted his continuing belief that his entire transcript was coming in, until two days before the end of the trial. At that point, Mr. Gombiner admitted that he was wrong; the transcripts of Bennett's testimony at the first trial were not coming into evidence. (Tr. 185:23-186:03) Bennett recalls that he said: "[W]ell, you know, I'll testify then." (Tr. 186:03-04) Mr. Gombiner then told him "there's no time to prepare, you know, we haven't spent any time going over anything, getting ready, you know, we just don't have the time." According to Bennett, Mr. Gombiner then made another promise: to get as much of Bennett's position into the summation as he could. (Tr. 186:04-06)

Bennett maintains that "nobody ever" advised him that he had "a constitutional right to testify and that right was mine alone to make." (Tr. 186:22-24)  His legal research at Otisville disclosed that he had a constitutional right to testify.  His counsel never advised him of that and "they never sat down and explained all the elements of the charges to me." (Tr. 187:02-03)

While Bennett claims he was unlearned in the law (and his lawyers never adequately explained it to him; or how it applied to him; and continuously misled him about the law) he also claims that he is responsible for all the legal defenses.  At the first trial, he recognized that counsel was busy so he wrote out his own redirect.  In effect, he said: "[H]ere's the question.  Just ask me these questions." (Tr. 182:08-09)  He also helped select documents and prepare exhibits.

At the second trial, Bennett conceded that Mr. Gombiner might have done a good job attacking the lease fraud counts of the indictment: "Yeah they did a good job.  They did a good job because I explained it to him.  He didn't have a clue what it was." (Tr. 187:15-17)  Had he been advised of the elements, Bennett states that he would have selected certain discovery materials which would have prevented his conviction on the security fraud counts and the money laundering counts at the second trial.

Bennett does not contest that the indictment was explained to him; nor does he contend that he did not understand the indictment; he argues that if the elements of the crime had been explained to him, he would have understood he had "defenses to the charges." (Tr. 192:26-193:21)  Bennett now believes that many of the errors in his first trial were repeated and made worse in the second trial.  Bennett became aware of this when he "subsequently learned of [it] in [his] research." (Tr. 193:02)  His lawyers never

16

told him that one "element of securities fraud is materiality." (Tr. 194:22-23)  While he had

heard the word "material" but he "didn't even know what 'element' was.  [He] didn't even

know 'materiality element." (Tr. 195:19-21)

Had his attorneys explained the significance of "materiality" Bennett "would have

testified under any set of conditions." (Tr. 199:10-14)  Based on what he now claims to

know, as a result of his legal research, the evidence of the securities fraud at the first trial

was insufficient.  Knowing that now, Bennett claims he was misled into thinking that the

introduction of his testimony from the first trial would be an adequate substitute for his

live testimony.  What was really required ─had he only been given a full explanation of the

elements─was his testimony at the second trial.

Mr. Gombiner knew from his discussion with the jurors from the first trial that

Bennett was not as persuasive as he believed.  The Court notes that many of Bennett's

answers at the hearing on June 8 and 9 were long and rambling and difficult to follow.

(See Tr. 195:13-197:25; 215:07-217:19)  Even a casual reading of these transcripts

supports Mr. Gombiner's conclusion that Bennett would have been less than convincing at

a second trial.  (Tr. 199-200)

With regard to discussing plea negotiations between trials, Bennett claims he only

spoke with Mr. Byrnes and denied having any conversation about a plea with Mr.

Gombiner.  (Tr. 258:07-259:24)  Mr. Gombiner recalls such conversations as occurring

before the second trial and describes them as "heated."  Experience and logic teaches that it

is best to have plea negotiations prior to trial.  Certainly in 1999, when the sentencing

guidelines were mandatory, that would be the only way for Bennett to earn a 3-level

reduction for acceptance of responsibility and an early plea of guilty.  (See U.S.S.G. §

3E1.1).  Further, Mr. Gombiner is correct: after the result of the first trial, Bennett had

maximum leverage to negotiate a plea.  That leverage dwindled as the second trial date

approached and trial commenced.  The Court credits Mr. Gombiner's and Mr. Yankwitt's

testimony on plea negotiations and rejects Bennett's version.

Since Bennett insisted on proceeding to trial, the next question to be addressed is

whether Bennett should testify again.  Obviously, Bennett knew he could testify, since he

testified at his first trial.  Bennett agrees that the question of his testifying was discussed,

but he places the discussion one week into trial.  Bennett claims he accepted his counsel's

advice not to testify only because Mr. Gombiner assured him that the entire transcript of

his testimony at the first trial would be used at the second trial.  But Mr. Gombiner did

not give such advice and the assertion he did is preposterous.  A lawyer with Mr.

Gombiner's skill, experience, intelligence and knowledge of the Federal Rules of

Evidence would recognize the impossibility of doing that.  Bennett's testimony says more

about his willingness to dissemble and distort in order to achieve his goal than it does

about what happened prior to, and during his second trial.  The same may be said of his

so-called 'fear' that Judge Martin was 'predisposed' against him and that 'predisposition'

forced him to accept Mr. Gombiner's proposal to use the transcripts of the first trial rather

than testifying again.

The Court credits both Mr. Yankwitt's and Mr. Gombiner's testimony that,

consistent with their practices, each advised Bennett of his right to testify.  These

conversations took place before the second trial commenced.  Each attorney separately

recommended Bennett not to exercise his right to testify.  Mr. Gombiner had observed

Bennett's testimony at the first trial.  He observed the jury.  He was in a perfect position to

reasonably conclude that Bennett's testimony at the first trial was neither effective, nor persuasive.  After the trial, Mr. Gombiner then spoke with the jury and learned it was 10-2 for conviction; and many of the jurors thought Bennett was lying.  Mr. Yankwitt had read the entire transcript of the first trial and he believed that the conviction on perjury and obstruction of justice counts would create real problems were Bennett to testify again.

There was a sound basis for defense counsel's recommendation that Bennett not testify, even though he had a right to do so.  In this situation, Mr. Gombiner and Mr. Yankwitt concluded there were no good choices, but the better course was to allow the government to use the prior transcript for a limited purpose, rather than to put Bennett on the stand and open him to cross examination.  Certainly there was a substantial basis for the concern that cross examination at the second trial would be more effective than at the first trial.  And it was not unreasonable for defense counsel to conclude that a defense based on Bennett's explanation might not ring true.

Rather than trying to explain how the same lease was sold more than once, or how a lease could be sold and also pledged to a bank, the defense determined to mount an all out assault on the Government's case, including a direct attack on the credibility of the prosecution's key witnesses.  That too was a sound legal decision and the defense team followed that strategy.  Mr. Yankwitt's opening called into serious question whether the government could prove the charges beyond a reasonable doubt because so much of its proof was based on lies.  The thrust of the opening suggests that Bennett's testimony was not critical to the defense.  This in turn confirms that the decision that Bennett not testify

had been made before trial started.[6]  Mr. Gombiner's closing argument illustrated the

continuity of the defense's strategy.  It cannot be said that the strategy was ineffective,

because the jury was unable to convict on numerous counts.

Bennett's argument that his counsel were ineffective because they overrode his

desire to testify is rejected.  It is clear that he knew he had a right to testify, and he chose

not to exercise it, after being properly advised of his right.  This advice and consultation

occurred prior to the second trial.  Again, Bennett's claim that Mr. Gombiner told him that

the transcript of his testimony at the first trial would be received in evidence at the second

trial is preposterous and is rejected.  So, too, is Bennett's claim that he told Mr. Gombiner

at the end of the Government's case that he wanted to testify.

The Government's cross examination of Bennett at the June 9 hearing was a vivid,

if abbreviated, example of what would have happened had he testified at the second trial

and been subjected to a more extended cross examination.  If nothing else, it

demonstrated the correctness of Mr. Gombiner's and Mr. Yankwitt's advice that it would

be very unwise for Bennett to testify at his second trial.  Indeed, the cross examination

did far more than that.

It was devastating to Bennett's credibility.  Of course, Bennett's conviction for

perjury and obstruction of justice are particularly probative of his lack of credibility.

(See Fed. R. Evid. 609(a)).  Cross examination demonstrated that Bennett is a person who

would say or do anything he thought would give him a temporary advantage.  In any

---

[6] In his opening statement to the jury at the second trial, Mr. Yankwitt said that at the first trial, "Pat
Bennett took the witness stand, he gave up his constitutional right not to testify, he voluntarily gave up that
right . . . ."  (Trial Transcript, pg. 64, May 18, 1999)  Bennett knew he had the right to testify or not testify
and that right is of constitutional dimensions.

factual dispute between Mr. Gombiner and Mr. Yankwitt on one side and Bennett on the other side, Bennett is not credible.

During cross examination, Bennett's demeanor changed markedly.  He changed from being talkative, and combative, a person wanting to be in charge, to a battered, visibly diminished witness.  His voice became less vibrant; he was subdued; he became monosyllabic, as he admitted that he fabricated documents that he produced to the SEC (Tr. 274); he backdated documents (Tr. 274); whited-out information on certain documents (Tr. 274); directed others to falsify documents (Tr. 274); planned how he and others were to lie (Tr. 274); encouraged others to lie (Tr. 274-275); and on multiple occasions while under oath, gave knowingly false testimony.  (Tr. 275)

Bennett told lies big and small; he lied about his college education (Tr. 275); and he lied about business transactions as to which he had already backdated certain documents.  (Tr. 276)  And the misbegotten purpose of his false testimony was to convince the SEC that certain business transactions were legitimate.

Bennett's statements about the legal advice he was given, when he was given such advice, and how he came to decide not to testify at his second trial are rejected as incredible.  As he has in the past, he lied again.  He had effective defense counsel and they advised of his right to plead or to go to trial.  Having opted for trial, they advised him of his right to testify or not testify.  They encouraged him not to testify, and they had good reason for that advice.  Bennett's claim that his lawyers advised him that the entire transcript of his testimony from the first trial would be received in evidence is a fabrication.  The argument that he was afraid of Judge Martin and therefore acquiesced in the supposed use of the transcript is also rejected.  Bennett knew he could not testify

without exposing himself to substantial cross examination; his counsel advised him not to testify; he considered that advice and then he chose not to testify.

His argument that the elements of the crimes charged in the indictment had not been explained is rejected.  The indictment was explained to him;[7] and he heard Judge Griesa explain the elements of each of the crimes charged during the first trial.  (Tr. 257:11-17)  Bennett's argument that if the elements of each charge had been explained to him, he would have taken the stand, and explained them to the jury's satisfaction is sheer speculation.

The Court concludes that defense counsel was effective.  Effective defense counsel advised Bennett of his right to testify, but further advised him that it was unwise to do so.  There was a good reason for that advice.  Bennett exercised his rights and chose not to testify.  Bennett's current arguments to the contrary are based on untruths, inaccuracies, second guessing, and speculation.

Bennett understood the elements of the charges against him; and his decision not to testify had nothing to do with his being informed or not of the elements.  Bennett, with the advice of competent and effective counsel, decided not to testify.  Instead, defense counsel mounted an attack on the credibility of key government witnesses.  The strategy saved Bennett from testifying again and given the results achieved, cannot be said to have been ineffective.

This Opinion constitutes the Court's report to the Second Circuit, pursuant to the procedures set forth in United States v. Jacobson, 15 F.3d 19, 22 (2d Cir. 1994), on "the

---

[7] Bennett argues that he was tried on a superseding indictment at the second trial, suggesting that the new indictment should have been explained to him.  But the major change between the two indictments is the deletion of the perjury and obstruction counts from the first indictment.  There was no substantial difference between the two indictments.

circumstances under which counsel undertook the actions and omissions that the

petitioner alleges overrode his desire to testify." The Second Circuit has previously

directed that either party to the appeal may restore jurisdiction to the Circuit Court by

letter to the Clerk's Office within 30 days of this decision. A new notice of appeal is not

needed.

     The District Court Clerk is directed to close this matter.

Dated: New York, New York
      November 3, 2009

SO ORDERED

PAUL A. CROTTY
United States District Judge

**Copies Mailed By Chambers**